**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**David Neely,**

    *Plaintiff*,

v.                                            **Case No. 3:13-cv-415
Judge Thomas M. Rose**

**Benchmark Family Services.,**

    *Defendant.*

---

**ENTRY AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT, (DOC. 23), AND TEMINATING CASE.**

---

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. 23.) Therein, Defendant requests that the Court award summary judgment on all of Plaintiff's claims stemming from Plaintiff's dismissal from employment with Defendant six months after his hire. Plaintiff's federal claims are for disability discrimination and retaliation.  Because Plaintiff cannot prove he was disabled and was not engaged in protected conduct, both of these claims fails. Plaintiff's state law claims are similarly without merit.

**I.  Background**

Plaintiff David Neely claims to have experienced sleeping problems including only getting only 2 to 3 hours of restful sleep per night, falling into micro sleeps during the day, and snoring, from adolescence to the present. (Doc. 26-1, Pl. Ex.1, Affidavit of David Neely.)  Neely affies that from 2002 to 2005, he sought treatment from his family physician, Dr. Shah.  (Doc. 26-1, Pl. Ex.1.)  From 2009 to 2012, he sought treatment from a new family physician, Dr. Froelich.  Dr.

Froelich prescribed Concerta partially for Plaintiff's sleep issues.  She also prescribed Synthroid for hypothyroidism and to increase energy levels.

In April 2010, at Dr. Froelich's referral, Neely was evaluated by Dr. George Burton, a specialist who deals with sleep issues, at Kettering Medical Center.  According to a letter from Dr. Burton to Dr. Froelich, Plaintiff "has absolutely horrible sleep hygiene, sleeping basically when he feels like it, but usually going to bed around 3 a.m. and sleeping through till 1 p.m." (Report Dr. Burton, Doc. 23-9 at 1, PAGEID 218.) Dr. Burton further states, "It is clear that [Plaintiff] is poorly disciplined in both his sleep hygiene, and his taking of medication, as well as his food consumption." (Id. at 3, PAGEID 220).  Dr. Burton's "impression" was that Plaintiff "has poor sleep hygiene, insufficient sleep syndrome, and probable obstructive sleep apnea." (Id. at 6, PAGEID 222).  Dr. Burton ruled out physiological conditions including orthopnea or paroxysmal nocturnal dyspnea, narcolepsy, insomnia, parasomnia, restless leg syndrome, cataplexy, hynagogic or hypnopomic hallucinations, automatic behavior or sleep paralysis. (Id. at 1, 3, PAGEID 218, 220).  Dr. Burton recommended a "free T4 and TSH study as well as a polysomnogram, and [maintaining] a sleep log." (Doc. 26-1, at 12, PAGEID 273.)  There is no evidence Plaintiff followed this advice, declining to allow Dr. Burton's impression to mature into a diagnosis.

Seven months later, on December 5, 2011, Defendant Benchmark Family Services hired Neely.  At this time, Neely was self-treating himself by taking supplements and drinking coffee. (Doc. 26-1.)  Within two weeks he was promoted to Support Administrator. Unlike a Support Specialist, as Support Administrator he was able to "manage support operations and support specialist," reported directly to the Chief Information Officer. (See Job Descriptions of Support

2

Specialist and Support Administrator, Doc. 26-1). There was no increase in compensation or benefits as a result of this change. (Id.)

Shortly after being moved to Support Administrator, Benchmark Family Services began taking issue with Plaintiff's performance in the office and on the job. (Hanrahan Affidavit, Doc. 23-15 at 2, PAGEID 236). Benchmark Family Services describes these issues as slow response times to IT work orders; lack of attention to job duties, including being unaware of new IT work orders coming in; failure to close tickets out and lack of knowledge in the process of closing out IT work orders. (Id; see also Exhibit H, Verbal Reprimand, Doc. 23-6, PAGEID 210.) Another employee affied that, when not actively working on tickets, Plaintiff was often seen playing on his phone, playing games or doing other non-work related things. (Id.) Plaintiff, by means of affidavit, denies this. Defendant contends, that Plaintiff was having issues with staying awake while at work and would often be found sleeping at his desk or would fall asleep during meetings. (Id.) Plaintiff asserts by means of personal affidavit that these were micro-sleeps caused by a sleep disorder.

During the first several months of his employment, Neely mentioned to Jason Hanrahan and Ryan Darling, two members of Benchmark Family Services management, that he had a sleeping disorder which caused him to suffer fatigue and experience micro sleeps. (Doc. 26-1.) Darling suggested he take some supplements, "so it's not an issue." (Id.) When Neely explained he was trying to treat the issue himself, Darling replied, "Well, try to hurry up with that." (Id.)

Plaintiff's supervisors, over the course of several months, discussed these issues with Plaintiff. (Hanrahan Affidavit, Doc. 23-15 at 2, PAGEID 236.)

> 19. As early as March 2012, Ryan Darling and I started noticing that Plaintiff would fall asleep while at work.

3

> 20. Employees were finding it difficult to work with Mr. Neely sleeping while at his desk or in meetings.
>
> 21. Mr. Neely's sleeping was a distraction during meetings and/or trainings both within the IT Department and within BFS as a whole.
>
> 22. Mr. Darling and/or I would have to step in and put an end to employees who were making comments directed to Mr. Neely's sleeping all the time while at work, which interfered with our ability to do our jobs.
>
> 23. Mr. Darling and/or I discussed this issue with Mr. Neely numerous times between at least March 2012 and May 2012.
>
> 24. Mr. Neely was sound asleep, often times requiring someone to wake him up or to do something that would wake him up, not just dropping his head and waking up immediately.
>
> 25. Mr. Neely would often be asleep for at least five to ten minutes before being woken up.
>
> 26. Mr. Neely would always respond that he thought he had a sleep disorder.
>
> 27. Mr. Darling and/or I would request that Mr. Neely provide us with documentation of his sleep disorder, and also recommendations from his treating physician on accommodations in the work place.
>
> 28. During Mr. Neely's entire tenure of employment and during the entire EEOC investigation process, we received no documentation of Mr. Neely having a disability or any request for accommodations.

(Doc. 23-15, at 3, PAGEID 237.) Plaintiff, who apparently was not deposed, denies this by means of an affidavit, asserting he suffered from micro sleeps that did not affect his performance.

Plaintiff did not seek medical treatment while employed at Benchmark Family Services. (See Answer to Admission Request #6, Doc. 23-10, PAGEID 224.)

On May 25, 2012 Neely received a "Verbal Reprimand" for alleged performance issues and for "continually fall[ing] asleep during the workday, trainings and meetings." (Exhibit H of Defendant's Motion, Doc. 23-6, PAGEID 210.) The reprimand stated it was issued for lack of urgency surrounding tickets and other work performance related issues. (Id.) It claims Plaintiff had the highest average response time of the entire IT team, with his response time being almost double that of anyone else in the IT Department. (Id.) It claims that, in the three months preceding his reprimand, others in the IT Department had to pick up his slack in assigning work orders, or alerting Plaintiff that there were work orders to be assigned. (Id.) Plaintiff had trouble remembering between the various domains and networks that the IT managed, and had problems troubleshooting and correcting issues with printers. (Id.) The verbal reprimand informed Plaintiff he was returning to the Support Specialist position, and his introductory period was extended an additional six months. (Id.; see also Exhibit "A".)

When Benchmark Family Service confronted Neely with the reprimand on May 25, Neely claimed again that a sleeping disorder caused fatigue and micro sleeps. Darling appeared frustrated by his statement and responded, "Whatever. You're still falling asleep." Neely disagreed with Darling about the merit of the alleged performance issues and about his sleeping disorder causing a disruption with his work. He also complained about the decision to demote him. Neely was demoted to his original position of Support Specialist and no longer was responsible for managing the team of support staff.

The following week, Neely spoke to his supervisor Jason Hanrahan about the demotion and write up. (Doc. 26-1.) He told Hanrahan he disagreed with the demotion and was quite shocked to have received it. He further complained to Hanrahan, "I don't feel it was fair to use my sleeping issues against me like that." Hanrahan stated he agreed to the Verbal Reprimand

5

signed by Darling. After the meeting, Neely claims to have sent messages to a human resources manager to discuss his dissatisfaction with the write up, demotion and discrimination. He claims to have never received a response.

The following week at work following Plaintiff's demotion, Plaintiff's co-workers perceived a bad attitude with his supervisors and other staff members. (Exhibit I; Affidavit Hanrahan; Affidavit Jeffers; Affidavit Merchant.) His co-workers attest to Neely being argumentative with supervisors and other members of the Department. (Id.) They also claim Neely was argumentative with a supervisor regarding department procedures. When asked by others in the Department to work on tickets, he would be grumpy or tell them to contact the Supervisors of the Department as it was "their" problem, not his. (Affidavit Jeffers; Affidavit Merchant; Affidavit Hanrahan.)

On June 1, 2012, Benchmark Family Services terminated Neely's employment. (Doc. 23-7, PAGEID 216.) Neely filed a complaint with the EEOC, receiving a right to sue letter on September 18, 2013.

On December 13, 2013, Plaintiff filed a complaint that conflates six distinct claims into "Count I." Plaintiff alleges that "Plaintiff's disability, perceived disability, and/or regarded disability, was the sole reason he was disciplined and fired" in violation of 42 U.S.C. § 12102 and Ohio Rev. Code § 4112.02(A). (Doc. 3, at 3, PAGEID 18, ¶¶ 18, 16.) The complaint similarly conflates claims for retaliation under state and federal law. (Doc. 3, at 2-3.) Claims for wrongful discharge in violation of public policy and intentional infliction of emotional distress are stated separately.

On October 30, 2014, after discovery, Defendant filed the motion for summary judgment currently under review. (Doc. 23.) Plaintiff has now responded to this motion, (doc. 26,) and Defendant replied, (doc. 27,) rendering it ripe for review.

## II.     Standard of Review

Federal Rule of Civil Procedure 56 and associated case law establishes the standard of review applicable to motions for summary judgment. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Alternatively, a court denies summary judgment "[i]f there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)). Thus, a court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits that it believes prove the absence of a genuine issue of material fact. *Id.* at 323. The burden then rests upon the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson,* 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright and Miller, *Federal Practice and Procedure* § 2726. Credibility determinations must be left to the fact-finder. *Id.*

In ruling on a motion for summary judgment, "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the Court is entitled to rely upon Rule 56 evidence specifically called to its attention by its parties.

**III. Analysis**

**A. Disability Discrimination**

Plaintiff's first claim arises under the Americans with Disabilities Act, 104 Stat. 327, 42 U.S.C. § 12101 *et seq.* and Ohio Civil Rights Act, Ohio Rev. Code, § 4112.02 *et seq.* The ADA provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); see also, *Lewis v. Humboldt Acquisition Corp., Inc*., 681 F.3d 312 (6th Cir. 2012) (en banc) (employee must show that disability was a "but-for" cause of his termination).

Disability discrimination claims under the ADA and Ohio Civil Rights Act can be analyzed together because they use the same evidentiary standards. *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004).

The ADA prohibits employment discrimination "against a qualified individual with a disability." 42 U.S.C. § 12112(a). In order to establish a violation of the ADA, a person must establish that: (1) she has a disability, as defined in the ADA; (2) she is qualified to perform the essential functions of her position, with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. *Demyanovich Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014).

The ADA bars discrimination "because of" an employee's disability, meaning that it prohibits discrimination that is a "but-for" cause of the adverse employment action. *Lewis v. Humboldt Acquisition Corp., Inc*., 681 F.3d 312, 314 (6th Cir. 2012); *Molina–Parrales v. Shared Hospital Servs. Corp.*, 992 F. Supp. 2d 841, 855 (M.D. Tenn. 2014). Thus, in order to proceed with her claims under the ADA, Plaintiff must meet the threshold burden of showing that she is a "disabled" individual within the meaning of the ADA. If Plaintiff has no "disability," then Defendant cannot be liable for discrimination because of it or failure to accommodate it.

A plaintiff may prove the third element by presenting either direct or indirect evidence. Direct evidence is where an employer's statement directly shows discriminatory motive.  See *Schlett v. Avco Fin. Servs., Inc.*, 950 F. Supp. 823, 828 (N.D. Ohio 1996).  The Sixth Circuit

stated in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994), that evidence that would require the jury to infer a fact is not direct evidence. Direct evidence, in the form of verbal comments, will be similar to an employer telling its employee, "I fired you because you are disabled." *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998). In analyzing discriminatory comments, factors to consider include whether a decision maker or an agent made the comment, whether the comment was related to the decision-making process, and whether the comment and the discriminatory act were close in time. See *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994).

On May 25, 2012 Benchmark Family Services disciplined and demoted Neely for alleged performance issues and for "continually fall[ing] asleep during the workday, trainings and meetings." See "Verbal Reprimand" attached as Exhibit H to Defendant's Motion. If Plaintiff has evidence sufficient to prove that he was "disabled" for purposes of the ADA, this reprimand could constitute direct evidence of discrimination based on a disability related to a sleep disorder.

Under the ADA, a "disability" is defined in three ways: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1). For purposes of this definition, "major life activities" include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2).

Thus, to prevail, Plaintiff must show both that he was disabled and that the disability substantially limited a major life activity. Unfortunately for Plaintiff, the medical record he has provided shows only two instances where there has been any reference to sleep problems by

Plaintiff to a physician. (Report Dr. Burton; Exhibit J, Doc. 23-8, PAGEID 217) The first instance was a discussion during an office visit with his regular attending physician, Dr. Froelich. (Exhibit J.) Dr. Froelich made no definite diagnosis, but referred him to Dr. Burton, a specialist who deals with sleep issues. (Id.)

The second instance is recorded in a letter from Dr. Burton to Dr. Froelich. (Report Dr. Burton, Doc. 23-9 at 1, PAGEID 218.)   It further states that "It is clear that he [Plaintiff] is poorly disciplined in both his sleep hygiene, and his taking of medication, as well as his food consumption.". (Id. at 3, PAGEID 220).   Dr. Burton's preliminary impressions are that Plaintiff "has poor sleep hygiene, insufficient sleep syndrome, and probable obstructive sleep apnea." (Id. at 6, PAGEID 222).   This evidence fails to show that Plaintiff's alleged sleep issues are the result of a physical or mental impairment as required to prevail in an ADA claim.

Plaintiff is unable to establish that his "sleep issues" are the result of a physical or mental impairment as defined under federal and state laws.  Dr. Burton's letter indicates that there are other causes, other than a physical or mental impairment, for Plaintiff's sleep issues.   Dr. Burton has ruled out many physiological conditions, including orthopnea or paroxysmal nocturnal dyspnea, narcolepsy, insomnia, parasomnia, restless leg syndrome, cataplexy, hynagogic or hypnopomic hallucinations, automatic behavior or sleep paralysis. (Id. at 1, 3, PAGEID 218, 220). Similar to obesity, the Court holds that, in order for a sleep disorder to be a disability under the ADA, a plaintiff must show that the condition is the result of a physiological condition. *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d. 436, 443 (6th Cir. 2006), see also, *Anderson v. Macy's Inc.*, 943 F. Supp. 2d 531, 545 (W.D. Pa. 2013).   In the instant case, Plaintiff put forth no evidence of a disability, nor did he provide his employer with any documentation during the tenure of his employment.

Plaintiff counters that the United States Supreme Court has held the ADA requires those claiming protection to "…offer evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 198 (2002).  *Toyota*, however, refers not to a plaintiff determining a disability in terms of his own experience, but whether a major life activity is affected.  Plaintiff fails on this second point as well.

The available evidence suggests that Plaintiff's sleep issues are the result of his own behavior, and not a physiological condition.  Dr. Burton refers to Plaintiff's own poor discipline when it comes to sleep, his poor sleep hygiene, and has ruled out numerous conditions which would be a physiological component of those.  While sleep apnea may be a serious impairment for many, Plaintiff has not adduced evidence that would allow that conclusion in his case.  He declined to follow up on Dr. Burton's recommendation of a "free T4 and TSH study as well as a polysomnogram, [or maintaining] a sleep log." Doc. 26-1, at 12, PAGEID 273.

Assuming arguendo that Plaintiff, by virtue of his own assertions and without expert testimony, had established that he has a physical or mental impairment, he has not put forth any major life activity in which he is substantially limited.   Relying on the same source, Plaintiff also claims "he is often sleepy during the day but it does not interfere with his work."   (Report Dr. Burton, Doc. 23-9 at 3, PAGEID 220).   Plaintiff alleges that his "sleeping disorder did not prevent him from doing his job in a competent, professional manner." (Complaint ¶ 8).  Plaintiff also alleges that he falls "into what are known as 'micro sleeps,' where he loses focus and closes his eyes for no more than a few seconds at a time." (Complaint ¶7). Cf. *Jones v. AKKO Fastener, Inc.*, 2010 WL 3365940, *11 (S.D. Ohio 2010) ("Jones has evidently been able to function with sleep apnea since 1998. While sleep apnea may well constitute a disability for some individuals, Jones'

descriptions of the effects of his condition are insufficient to establish the level of severity required to qualify as a "substantial limitation" on major life activities."); see also, *Boerst v. Gen. Mills Operations*, 25 Fed. App'x 403, 412 (6th Cir. 2002) (noting that the inability to get more than two to four hours sleep at night, while inconvenient, lacks the kind of severity required to qualify the ailment as a substantial limitation); and *Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 106 (D. Conn. 2006) (plaintiff diagnosed with the "impairment" of insomnia was found not to be substantially limited in her major life activities where she failed to show that her sleep was substantially affected more than that of the normal person or general population).

Plaintiff, however, also claims that he is disabled under the "record of impairment" prong of the definition of disability. A plaintiff has a "record of impairment" if he or she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002); 28 C.F.R. § 35.104 (2005); 29 C.F.R. § 1630.2(k) (2005). Courts that have analyzed this prong have held that it includes "people who have recovered from previously disabling conditions ... but who may remain vulnerable to the fears and stereotypes of their employers." See *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 509 (7th Cir. 1998) (holding plaintiff had established a genuine dispute of fact regarding whether she was disabled where she had a record of a learning disability in the past). The "plaintiff only needs to show that 'at some point in the past' he had [a substantially limiting impairment]." *Knight v. Metro. Gov't of Nashville & Davidson Cnty., Tn.*, 136 Fed. App'x 755, 760 (6th Cir. 2005) (holding that a police officer who was not presently impaired, but who was previously injured in a motorcycle accident on the job and received disability pensions for twenty years, during which he worked intermittently as his injuries allowed, had raised a factual dispute as to whether he had a record of disability).

Because Congress intended the existence of a disability to be determined by defining disability "with respect to an individual," the determination of whether an individual is substantially limited in a major life activity must be made on a case-by-case basis. *Toyota*, 534 U.S. at 198. Merely submitting a medical diagnosis of an impairment is insufficient to establish disability status. *Thompson v. Rice*, 422 F. Supp. 2d 158, 170 (D.D.C. 2006) (citing *Toyota*, 534 U.S. at 198). Instead, plaintiffs must offer "evidence that the extent of the limitation ... is substantial" within the meaning of the statute. *Toyota*, 534 U.S. at 198.

While a diagnosis might not be absolutely necessary, in this situation, some diagnosis must explain the duration or severity of the impairment, or describe how the impairment might impact Plaintiff's ability to work or perform other major life functions. *Osborne v. Eisner*, 696 F. Supp. 2d 73, 76 (D.D.C. 2010)(Orthopedic evaluations insufficient). See also *Moss v. Pennyrile Rural Elec. Co-op*, 2014 WL 1056593, *5-6 (W.D. Ky. 2014) (dismissing because "the record reflects no medical proof supporting a record of disability theory," and Plaintiff "did not properly assert a record of disability theory in the Perfected Charge he filed with the EEOC.")[1] See also *Maldonado v. Cooperativa de Ahorro*, 685 F. Supp. 2d 264(D.P.R. 2010); and *RiveraMercado v. Scotiabank De Puerto Rico-Inter.,* 571 F. Supp. 2d 279 (D.P.R. 2008).

Plaintiff asserts that Dr. Burton's letter establishes a record of disability. Again Plaintiff falls short. Dr. Burton recommended a "free T4 and TSH study as well as a polysomnogram, [or maintaining] a sleep log." Doc. 26-1, at 12, PAGEID 273. Plaintiff declined to follow these steps, steps that might have conceivably created a record of impairment, and whose absence leaves a void.

---

[1] In the instant case, no copy of the EEOC complaint was filed to allow the Court to ascertain what claims were preserved.

Finally, Plaintiff also claims to have been "regarded as" disabled by his employer. The ADA Amendments Act of 2008 ("ADAAA") modified the "regarded as" standard to only require that a plaintiff establish that a defendant took action based on a perceived impairment, regardless of whether the employer thought the impairment was substantially limiting. See 42 U.S.C. § 12102(3)(A). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Being regarded as having a physical or mental impairment "shall not apply to impairments that are transitory and minor." 42 U.S.C. § 12102(3)(B).

Plaintiff describes a work environment in which his sleep issues are dismissed as minor. This is inherently at odds with his employer regarding him as disabled. Cf. *Tate v. Ancell*, 2011 WL 3859913, *5 (S.D. Ill. 2011) ("Tate "never formally requested an accommodation from DRS prior to September 11, 2007. There is nothing to suggest DRS regarded Tate as having such impairment. Further, there is nothing to suggest that Tate believed his sleep apnea was severe enough for him to mitigate the effects of his sleep apnea as he did not lose weight or use a CPAP as recommended by his doctor.") Here, as in *Tate*, Plaintiff did not consider his condition serious enough to follow through with a doctor's recommendations. Plaintiff does not strengthen his position by then both asserting that his employer was dismissive of his alleged disability and that he was so affected by it that his employer regarded him as disabled. See *Daniel C. Miller and Kids, Inc. v. Defina*, 2014 WL 6786131, *4 (E.D. Tex. 2014) ("The Court will not permit Plaintiffs to take inconsistent positions as to this summary judgment issue."); and *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 271–72 (9th Cir.1996) ("We…recognize that a discrimination plaintiff

15

who seeks to show she is substantially limited in her ability to work must tread carefully so as not to undo her contention that she is qualified for the position. However, Bradley undermines her credibility by simultaneously telling two different stories about her work performance.").

Plaintiff has not put forward evidence that would allow any rational trier of fact to conclude that he was disabled. Because of this, summary judgment will be awarded to Defendant on Plaintiff's disability discrimination claims.

**B. Retaliation**

Defendant also seeks summary judgment on Plaintiff's claims of retaliation. Retaliation is forbidden by Title VII:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). As with Plaintiff's disability discrimination claims, Plaintiff's federal and state law claims of retaliation can be analyzed together. *Baker v. Buschman Co.*, 713 N.E.2d 487 (Ohio App. 1998) ("Federal law provides the applicable analysis for reviewing retaliation claims" in Ohio.).

To prevail on a claim of retaliation, a plaintiff must show that (1) he engaged in protected activity, (2) his exercise of protected civil rights was known to defendant, (3) defendant thereafter took an employment action adverse to him, and (4) there was a causal connection between the protected activity and the adverse employment action. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997).

A plaintiff may prevail on a disability-retaliation claim even if the underlying claim of disability fails. *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007)(citing *Soileau v. Guilford of Me.*, 105 F.3d 12, 16 (1st Cir. 1997); *Cassimy v. Bd. of Educ.*, 461 F.3d 932, 938 (7th Cir. 2006); *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004); *Heisler v. Metro. Council*, 339 F.3d 622, 630 (8th Cir. 2003)); and *Baker v. Windsor Republic Doors*, 414 Fed. App'x 764 (6th Cir. 2011). "Claims of improper disability-related…retaliation may be brought by any applicant or employee, not just individuals with disabilities." 29 C.F.R. §1630, App. at n. 1 (2011).

One might wonder how retaliation claim in the absence of a disability can be squared with the text of the statute. As explained in *Kirkeberg v. Canadian Pacific Ry.*, 619 F.3d 898, 907-08 (8th Cir. 2010), an employee who asserts a right under 42 U.S.C. § 12112(b)(5)(A) to obtain reasonable accommodation for an alleged disability has not "opposed any act or practice made unlawful" by the ADA. Nor has he "testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the ADA.

However, the line of cases relied upon by the Sixth Circuit in *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007) explain that "[a]n individual who is adjudged not to be a qualified individual with a disability may still pursue a retaliation claim under the ADA as long as [he] had a good faith belief that [a] requested accommodation was appropriate." *Heisler v. Metropolitan Council*, 339 F.3d at 632 (internal quotations and citation omitted). *Heisler* relied for this proposition on *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183 (3d Cir. 2003), which reasoned that "[t]he right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC," and that "'it would seem anomalous ... to think Congress intended no retaliation protection for employees who request a reasonable

17

accommodation unless they also file a formal charge.'" *Id*. at 191 (quoting *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)). Thus, "although '[i]t is questionable' whether an employee who merely requests a reasonable accommodation 'fits within the literal language of the statute,' *Soileau*, 105 F.3d at 16, we are bound by *Heisler* to conclude that making such a request is protected activity for purposes of 42 U.S.C. § 12203(a)." *Kirkeberg v. Canadian Pacific Ry*., 619 F.3d 898, 907-08 (8th Cir. 2010)

Plaintiff would have the Court extend this reasoning even further to himself, a litigant who was not disabled under the act, unlike the cited cases, did not request an accommodation and had not yet filed a formal charge. Defendant seeks summary judgment on Plaintiff's retaliation claim on the basis that Plaintiff cannot put forth any evidence that he was engaged in protected activity.

Other courts have refused to extend retaliation claims to employment actions taken after an employee's complaints of health conditions to a manager, and so will this Court. See *E.E.O.C. v. Product Fabricators, Inc*., 763 F.3d 963, 972 (8th Cir. 2014) (plaintiff's complaints regarding his left shoulder and the potential need for surgery on his right shoulder were not requests for an accommodation.).

### C. Wrongful Discharge in violation of Public Policy

Plaintiff does not oppose Defendant's motion for summary judgment on Plaintiff's claim of wrongful discharge in violation of public policy. Summary judgment will be granted in favor of Defendant on this claim.

### D. Intentional Infliction of Emotional Distress

Plaintiff also asserts a claim for intentional infliction of emotional distress. To establish a claim for intentional infliction of emotional distress, "a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was

18

extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of the plaintiff's serious emotional distress." *Phung v. Waste Mgmt., Inc.*, 644 N.E.2d 286, 289 (Ohio 1994). Liability can only be found where conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983) (quoting Restatement (Second) of Torts § 46 cmt. d), abrogated on other grounds by *Welling v. Weinfeld*, 866 N.E.2d 1051, 1054 (Ohio 2007).

Viewing the evidence in the light most favorable to Plaintiff, Defendant's decision to terminate Plaintiff was not "beyond all possible bounds of decency." An employer's decision to discharge an employee is not extreme and outrageous. See *Foster v. McDevitt*, 511 N.E.2d 403, 406 (Ohio Ct. App. 1986) (finding that an employer is entitled to act upon its legal rights, including its right to terminate an employee, regardless of whether it knew or intended that the act would add to employee's emotional distress). A decision to terminate an employee, regardless of whether the decision was discriminatory, is not sufficient to sustain a claim of intentional infliction of emotional distress. *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) ("[A]n employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more."). To prevail, Plaintiff would need evidence that the termination was conducted in an manner calculated to humiliate or in a manner of reckless disregard for emotional distress. Plaintiff's termination was effected by an ordinary termination notice.

**III.  Conclusion**

Because Plaintiff neither was disabled, had a record of being disabled, nor was regarded as disabled, summary judgment is awarded to Defendant on Plaintiff's discrimination claims. Because Plaintiff was not engaged in protected activity, summary judgment is awarded to defendant on Plaintiff's retaliation claim.   Because Defendants' motion for summary judgment on Plaintiff's claim for wrongful discharge in violation of public policy is unopposed, summary judgment is awarded to Defendant on Plaintiff's claim for wrongful discharge in violation of public policy.   Because there is no evidence Defendant engaged in outrageous behavior, summary judgment is awarded to Defendant on Plaintiff's claim of intentional infliction of emotional distress.   Because Plaintiff cannot prevail on any of his claims, Defendant's Motion for Summary Judgment, doc. 23, is **GRANTED**.   The Clerk is **ORDERED** to enter judgment in favor of defendant and against Plaintiff on all of Plaintiff's claims.   The instant case is terminated from the dockets of the United States District Court, Southern District of Ohio at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, April 20, 2015.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE